JEFFERSON PRATT & another *vs.* OGDENSBURG & LAKE CHAMPLAIN RAILROAD COMPANY & others.

On the trial of an action against three railroad corporations, whose roads form a continuous line, to recover for goods delivered on the several roads for transportation over the line, and destroyed by fire on the third road in the course of transportation, evidence of declarations of a master of transportation employed by the second and third corporations, not accompanying or forming part of any official act, nor within the scope of his authority, is inadmissible against either defendant.

On the trial of an action to charge common carriers with the loss of goods burned in one of their railroad cars, the defendants contended that the fire was caused by the plaintiff's negligence in putting hay into the car, and the judge, in reply to a request of the defendants for a ruling that, if the plaintiff put combustibles into the car in violation of their rules, or did so negligently or wrongfully independently of the rules, and the fire was caused thereby, he could not recover, instructed the jury only, that the plaintiff could not recover, if, knowing the rules, and in violation of them, he put combustibles into the car without the consent of the defendants, and this occasioned the loss. *Held*, that the defendants had good ground of exception. ·

On the trial of an action to charge three railroad corporations, whose roads formed a continuous line, with the loss of goods delivered to one of them for transportation over the line, without any written contract, and burned on the road of another of them in course of transportation, no written agreement between the defendants concerning mutual transportation of goods over their roads was shown to exist; there was conflicting parol evidence as to what were the terms of the plaintiff's contract for the transportation of his · goods, and what were the arrangements, if any, of the defendants, for mutual liability for goods carried over the line; and a bill of exceptions, allowed to a ruling of the judge that the defendants were liable jointly if either was liable, omitted to state the facts on which the ruling was based. *Held*, that the exceptions must be sustained.

The fact that a person who delivered goods to a railroad corporation for transportation accepted a defective car for their conveyance, knowing it to be defective, does not exempt the corporation from liability as common carriers for the destruction of the goods, through the defect in the car, while in course of transportation, without proof of a distinct agreement on his part to assume the risk arising from that cause.

TORT, with a count in contract, by Pratt and Harrison G. Brigham, against the Ogdensburg and Lake Champlain Railroad Company, a corporation, and John G. Smith and four other individuals named, " as they are trustees and managers of the Vermont Central Railroad and of the Vermont and Canada Railroad," to charge the defendants with the value of eleven horses killed, and the loss in value of five other horses injured, by being burned in and with a car on the Vermont Central Railroad, while in course of transportation from Potsdam Junction, in the state of New York, and other intermediate stations, to Boston. Answer, a general denial, and allegations that any loss which occurred was the result of the plaintiffs' negligence, and that the horses were transported by the defendants under a special contract and at the plaintiffs' own risk. Trial, and verdict for the plaintiffs, in the superior court, before *Rockwell*, J., who allowed a bill of exceptions substantially as follows :

" The plaintiff Pratt testified, in substance, that he engaged transportation for the horses, of John Graves, the station agent of the Ogdensburg road at Potsdam Junction ; that he had been engaged for many years in buying horses in Northern New York, and had generally carred them at that place ; that he applied to Graves for two cars, and engaged them of him for his horses, and told him to bill one car-load to him, and the other to the plaintiff Brigham, without designating which to himself and which to Brigham; that the horses actually belonged to them jointly, but he did not remember saying anything to the agent about that, and only told him to bill them as stated ; that he had carred horses there before, and said nothing in particular, only that he wanted two good cars, and had them so billed as stated above; that the price for transportation to Boston was to be $85 a car; that that was the same price which he had generally paid before, and was so stated or understood between them

that, when the day arrived for loading the cars, he was shown two cars, and examined them; that one of them was rotten at the top and forward end, and not fit to put horses in, and he partitioned off the front part of the defective car to the extent of some two feet; that he told the railroad men there that the car was not fit or suitable, and they told him they must take those cars or none; that the boards at the front end were dry and punky, so that the wood could be picked off with the fingers; that he took them, and he or his men loaded the cars with the horses, putting into the forward end two tubs of butter, and a skeleton wagon, taken to pieces, with enough hay, not exceeding five pounds, to prevent the wheels and parts from chafing or rubbing, and littering the rest of the car back of the partition with hay; that the car, for two feet down from the top all round, was open for ventilation, having iron rods running down and being about six inches apart; that he put in what horses he had at Potsdam station; put in some at Malone on the Ogdensburg road, and four more on arrival at Rouse's Point on the Vermont Central, two of them being in the car which was subsequently burned; that he did not pay the freight in advance; that he had previously always paid it at the end of the route in Boston; that he had two men aboard of the train, to take care of the horses, each having a free ticket for the passage; and that he did not pay the extra rates named in the printed tariff and rules hereinafter referred to.

" There was other evidence tending to show that the plaintiffs saw the cars when Pratt applied for them at Potsdam station; knew what their condition was, and deemed them unsafe and unsuitable; but contracted to take them, as they were in a hurry to get their horses through; and did it rather than wait for others; also, that the rule was, to allow a free passage for one man to each owner of horses to attend to them, a saloon car being provided for their accommodation on the train; and that the plaintiffs did not make known that they owned all the horses jointly, but had them billed as before stated, so that two free passes could be had instead of one. The plaintiffs took no receipt or bill of lading or other paper for the horses, but a way

bill was made and sent on the succeeding roads," entitled " Way bill of merchandise transported by Ogdensburg and Lake Champlain Railroad Company from Potsdam Junction to Boston *viâ* Concord," and describing two cars of horses as consigned respectively to Pratt and Brigham, one car to each, and for each consignee " one man in charge free."

" The defendants contended that the car took fire and burned by sparks from the engine setting fire to the hay or other combustibles which they contended that the plaintiffs put in the car; the plaintiffs, on the other hand, contended that the fire took from sparks igniting the rotten and dry car, owing to its defective condition as aforesaid ; and evidence was introduced in support of their positions by each side respectively. The plaintiffs also offered evidence tending to show that their practice had always been to put hay as litter in the cars, as was done in this car; and that this was known to and permitted by the person in charge of the trains for the roads. The defendants controverted this, and put in evidence the tariffs and rules of the roads; and offered evidence tending to show that those rules and regulations had for some eight years been in force and rigidly enforced, and that they had meanwhile been posted up in various depots and station-houses on the road, and in the saloon cars where all the drivers rode, and that the plaintiffs knew of them. The plaintiffs controverted the evidence of knowledge by their own evidence. Pratt testified that, when he engaged the cars, he expected such privileges as others had, and engaged them only on the usual terms and at the regular rates, but did not know of any published rules or rates at the time."

The copy of the " tariffs and rules," thus put in evidence, was on a single printed sheet, entitled, " Vermont Central Railroad Special Life Stock Tariff," and, after reciting certain rates of freight per ton, contained, under the heading " Directions," the following provisions :

" At these rates the owners are to load, unload and feed their stock, at their own expense and risk, and assume all risk that animals may cause to each other or to themselves, or damage in consequence of their breaking from the cars, or being over-

crowded, or otherwise. No risk will be assumed by the managers, nor damage allowed, unless specially agreed to when the animals are taken for transportation, and an additional price of 25 per cent. upon tariff rates paid.

" Any person paying freight on a full car, or more, of any kind of the above named live stock, will be entitled to one ticket only. A ticket will be furnished each drover, or person entitled to a free pass on the freight train, for the sole purpose of taking care of his stock, by the agent of the station where the stock is loaded.

" In consideration of drovers being permitted to ride free on the same train with their stock, for the purpose of taking charge of it, it will in all cases be their duty, or that of shippers of live stock, to examine cars before loading, and, if they accept them, the stock will be at their risk of loss or damage occasioned by doors being displaced or otherwise.

" Hay, straw, and like combustibles, will under no circumstances be allowed in a car with live stock. Persons violating this rule will not only suffer all loss which the same may cause to his or their own stock, but will be held responsible for all damage caused by such violation, whether it be to individuals, or to the railroad."

" The plaintiffs were allowed, against the defendants' objection, to testify in chief to a conversation with John W. Hobart, a master of transportation for the Vermont Central and the Vermont and Canada Railroad Companies, to the effect that Hobart said to the plaintiffs that the freight was divided between the two roads; that he had seen a contract which made the Ogdensburg road liable ; that the Ogdensburg road received more of the freight than their road did — some two thirds of it ; that he did not think their road was liable, but that the Ogdensburg Railroad Company was; that he had seen Mr. Brown, of that road, and that he did not think they were liable ; also that, some four or five weeks after the fire, one of the plaintiffs asked Hobart for a copy of the way bill; that a clerk at St. Albans made it out and gave it to one of the plaintiffs ; and it was offered and read, the defendants objecting and excepting.

" The plaintiffs also testified that they received a letter from Hobart, which they could not find; that they went up and saw the defendant Smith and Hobart together, and had a talk; that Smith wanted to know to whom they considered it belonged to pay; that they said they considered the railroad folks liable; that they did not deny their liability, only on account of the hay being put in; that Hobart said, in presence of Smith, that he was acting for the road and would like to have the matter adjusted, but did not wish to commit himself any way; and that he did not say what road he was acting for. The defendants objected to all these statements of and conversations with Hobart, as not evidence against them. The plaintiffs contended that Hobart's statement was evidence against the Vermont Central and the Vermont and Canada Railroads, of which Hobart was master of transportation, but not against the other defendant corporation. The judge so ruled, and admitted the evidence, the defendants excepting.

" Hobart was afterwards called by the defendants, and testified that he was master of transportation of said two railroad corporations in Vermont, but had no connection with the Ogdensburg road; that the latter was a distinct corporation, and managed independently of the other roads; that each road had its rate of tariff in the line, and the agents of the Ogdensburg, when taking through freight to Boston, added their own charges for the transportation on their road to the rates of the other intervening roads, and fixed the freight at a round sum for the whole route; but that the amount was paid at either end of the line, and divided between the several roads *pro rata* according to distance or miles traversed, a certain fixed percentage agreed upon and stated being first deducted to pay the terminal charges, and the settlements being made between the different companies monthly; that tariff rates were fixed by the mile on each road, and what either road took at the ends of the route, or at any intermediate station, was taken and carried over the roads, the price being given to the shipper in a round sum; and that the car taken on the Ogdensburg road goes through to Boston, each successive road in the line having its own engines and separate

men and operatives. This witness, in his cross-examination, stated that the roads divided the freight money thus received, in the round prices, once a month, first deducting the terminal charges, and then dividing the remainder into three parts."

A deposition of the defendant Smith was also read at the trial, which contained the following questions and answers:

"*Int.* 7. 'Was there any business connection between the Ogdensburg and Lake Champlain Railroad Company, and Vermont and Canada and Vermont Central Railroads, at the time of said fire; and if so, what was it?' *Ans.* 'There was a general business arrangement between those roads, for the receipt and delivery of freight. It was at this time customary for the Ogdensburg road to bill freight through from Potsdam and other connecting points on their road and beyond, at rates agreed upon from time to time between that road and our roads. It was customary to collect pay for the full freight at the place of departure or of ultimate destination, and our roads and the Ogdensburg road shared *pro rata*. Cars loaded on the Ogdensburg road at this time and for a long time before were taken through, over our roads, to Boston, and other points, without transshipment; and wherever damage has occurred on these from defect in the cars or improper storage, the damage has been borne by the road owning the car or improperly loading it, without respect to what road the injury happened upon; and this has been the custom ever since I have been connected with the management of the Vermont and Canada and Vermont Central roads, which is about eleven years.'

"*Cross-Int.* 8. 'If you have stated, in your direct examination, that there was any business connection between the defendants' roads, annex to your answer all contracts under which said connection exists, or copies of them.' *Ans.* 'There is no subsisting written agreement between our roads and the Ogdensburg road.'

"The defendants contended that they were not jointly liable, if at all; that the plaintiffs were bound to prove that the parties named in the writ were common carriers, as alleged; and that simply being trustees and managers of the road, as described in

the writ, if taken to be true, was not enough. But the judge ruled otherwise, instructing the jury that all of the several corporations were liable jointly, if either was liable, and for the whole loss; and that the individuals named in the writ as trustees and managers of the Vermont Central and Vermont and Canada Railroad Companies were each liable as common carriers, and representing the said corporation, without further proof than might be found in the pleadings and evidence as hereinbefore recited.

" The defendants contended further, that if the plaintiffs, or either of them, knew the said rules and regulations at the time, the liability of the defendants as common carriers was limited and restricted thereby; that, if the plaintiffs put hay or other combustibles into the car, in violation of the said rules, or if, independently of them, they did this negligently and wrongfully, and it occasioned the fire, they could not recover; that, if the plaintiffs knew the cars which they took at Potsdam station were unsafe and unfit for the purpose on account of their condition, and yet they accepted them rather than wait a week for better ones, and the fire occurred because of said defect and without the defendants' fault, the plaintiffs took the risk of them, and could not recover; that if the plaintiffs practised a fraud upon the defendants in regard to the ownership of the horses, and in having the horses billed, one car to each of them, to get a free ride for one more man, and did fraudulently so procure two free passages when otherwise entitled only to one, the contract was vitiated, and the defendants were not liable as common carriers; that if the direction and engagement was to bill and send the horses, one car to Pratt and the other to Brigham, they both being present when it was done, and engaging the transportation as individual owners of the horses in each car respectively, the contract would be single and not joint, and they could not recover; and that, the defendants being guilty of no negligence, the plaintiffs could not recover.

" The judge declined so to rule; and instructed the jury that, if the defendants were common carriers, they were obliged to carry safely; that it was not like a case where action is brought

to recover for negligence; that their duty of common carriers was to carry merchandise over their roads safely, unless prevented by act of God or enemies of the country, or some act or fault of the plaintiffs ; that, in order to change the liability, it must be shown that a requisition is brought to the knowledge of the plaintiffs, that it was known then, at the time of the arrangement, and that the contract was made recognizing it and in view of it; that, if the plaintiffs knew that the defendants did not allow straw or other combustibles to be put into the car, if this was brought home to their knowledge, it entered into the contract and varied it to that extent, and if they then put it in without the defendants' consent, and this occasioned the loss, they could not recover; that misrepresentations may be made so as to discharge liability, that is to say, representations material to the liability, and where a party is misled by it; that, if such misrepresentation is made to induce property to be billed to two persons and get a free pass for two, and this, under the facts proved, is material to the risk or liability, it would affect the liability of common carriers; and that the verdict should be against all of the defendants whom they should find liable, if any, for the whole loss, and for the value of the horses in Boston, and not in Vermont where they were lost or injured."

*A. A. Ranney,* for the defendants.

*A. C. Clark & A. Churchill,* for the plaintiffs.

MORTON, J. We are of opinion that several of the rulings at the trial of this case were erroneous, and that therefore a new trial must be granted.

1. Evidence of the declarations and admissions of Hobart was incompetent against either defendant. They were not declarations accompanying or forming part of any official act, and not within the scope of his authority. Such declarations are mere hearsay, and inadmissible against the principal. 1 Greenl. Ev. § 113. *Nutting* v. *Page,* 4 Gray, 581. *Fogg* v. *Pew,* 10 Gray, 409. *Bank of Brighton* v. *Smith,* 12 Allen, 243.

2. The defendants asked the court to rule that, if the plaintiffs put hay or other combustibles into the car, in violation of the rules of the defendants, or if, independently of the rules,

they did this negligently and wrongfully, and it occasioned the fire, they cannot recover. The court, in answer to this request, instructed the jury that, if the plaintiffs knew of the rules, and, in violation of them, put hay or other combustibles in the cars without the defendants' consent, and this occasioned the loss, they cannot recover. This instruction was correct as far as it goes, but it failed to meet a material part of the defendants' prayer, and was not sufficiently full. If the plaintiffs did not know the rule, they would be in no better position than they would be in if no such rule existed. Independently of any rule, if the loss was occasioned by the negligent or wrongful acts of the plaintiffs, the defendants would not be liable. It is not denied that, by the terms of the contract, the plaintiffs were to load, unload and feed their stock at their own expense and risk. If, in doing this, they were guilty of any negligent and wrongful act, without the defendants' knowledge, which occasioned the loss, they cannot recover, and the jury should have been so instructed. *Squire* v. *New York Central Railroad Co.* 98 Mass. 239.

3. The defendants except to the ruling of the court that the several corporations who are defendants were liable jointly, if either was liable. It is difficult to understand the bill of exceptions upon this point. If the defendants intended to except to the right of the court to take this point from the jury, the exception must be sustained. There was no written contract between the parties to this suit, and no written contract was shown between the different railroads forming the line over which the plaintiffs' horses were to be carried; all the evidence upon these points was by parol; and clearly it was the province of the jury to decide what was the contract between the parties, and what the relation of the different railroads to each other. The bill of exceptions does not state the facts upon which the ruling was based, and it is impossible for this court to know what facts the jury would have found if the evidence had been submitted to them. Thus we cannot assume, either that it was or was not proved that the Ogdensburg road made a contract with the plaintiffs by which they were responsible for the

safe carriage of the plaintiffs' horses beyond their own line. This is a question which must be submitted to the jury upon the evidence. So we cannot determine whether the arrangements between the different roads constituted them partners or *quasi* partners, so as to create a joint liability, because what these arrangements were does not definitely appear by the bill of exceptions. The only two witnesses who testify as to them state them differently.

The general principles upon which the question of the liability of several railroads, forming a continuous line, is to be decided, are stated in the recent cases of *Darling* v. *Boston & Worcester Railroad Co.* 11 Allen, 295; *Gass* v. *New York, Providence & Boston Railroad Co.* 99 Mass. 220; and *Burroughs* v. *Norwich & Worcester Railroad Co.* 100 Mass. 26.

4. The defendants asked the court to rule, that, if the plaintiffs knew that the cars which they took at the Potsdam station were unsafe and unfit for the purpose, on account of their condition, and yet they accepted them rather than wait a week for better ones, and the fire occurred because of such defect and without the defendants' fault, the plaintiffs took the risk of them, and cannot recover. This instruction was properly refused. The defendants were bound to furnish suitable cars for the transportation of such goods as they undertook to transport; and if they furnished unsafe or unfit cars, they would not be exonerated from liability by the fact that the plaintiffs knew them to be defective and accepted or used them. Nothing less than a distinct agreement by the plaintiffs to assume the risk would have that effect. But if the plaintiffs expressly agreed to assume the risk of defective cars, rather than wait a reasonable time for other cars, they cannot recover.

5. All the other rulings to which exceptions were taken appear to have been correct.          *Exceptions sustained.*