### FROHLICH *v.* PENNSYLVANIA CO.

1. CARRIERS—AGENCY OF CONSIGNOR.
    The consignor is the agent of the consignee in the shipment of the goods and whatever contract he makes with the carrier is binding on the consignee.

2. SAME—DEFECTIVE CAR—SELECTION BY SHIPPER.
    Where a glass manufacturer was accustomed to load such cars as were suited to his needs from among those which came to him loaded with materials, and he selected one which was defective, and injury to a shipment followed, the carrier was not liable on the ground of furnishing an unsuitable car.

Error to Wayne; Donovan, J. Submitted July 16, 1904. (Docket No. 73.) Decided November 9, 1904.

Case by Edward Frohlich, doing business as the Edward Frohlich Glass Company, against the Pennsylvania Company for damages to glass alleged to have been shipped in a defective car. From a judgment for plaintiff, defendant brings error. Reversed.

There is no substantial disagreement as to the facts of this case. Plaintiff, doing business in Toledo, Ohio, purchased from the Heidencamp Mirror Company, of Springdale, Pa., a carload of plate glass, in boxes weighing from 500 to 3,500 pounds each. The glass was consigned and shipped by the defendant railroad company to the plaintiff f. o. b. Springdale, Pa., freight allowance; consignee to pay the freight at Toledo, and deduct same from purchase price. The glass arrived in good condition. Plaintiff commenced to unload the car, and had removed one case. In attempting to remove the second, the iron roller upon which it was being moved plunged through the bottom of the car, causing a destruction of the contents of the case, weighing about 3,500 pounds. The car was an old coal car, with a trapdoor in the center, opening downwards for the purpose of dumping the load. It was worked with a chain, by which it was let down and raised up. In the bottom of the car were several holes. One or two of the plaintiff's witnesses testified that after it was unloaded they counted 17 holes. The glass was stacked in the two ends of the car, leaving a vacant space of about eight feet in the center. This space had no holes, and to plaintiff's employés appeared solid when they commenced unloading. The holes were under the boxes, and after their removal its defective condition was apparent. There was evidence that the car was suitable for shipping lumber, coal, or brick, or anything that would not be topheavy. It is substantially conceded that it was unfit for shipping glass. Plaintiff's manager testified that he did not think the car fit for hauling glass. One of plaintiff's foremen testified that he never saw a car of glass loaded on such a car. The car was received on August 14th by the Heidencamp Mirror Company, loaded with sand, and was unloaded in the afternoon of that day. It was loaded with glass on the 15th or 16th, and shipped on the 18th. All the witnesses in the case appear to agree that the car should not have been loaded with glass. The custom between the Heidencamp Mirror Company and the defend-

ant was that the mirror company might take any of its cars which were consigned to that company when unloaded, without asking permission, and use them for shipping their products, provided they were suitable for their use. This car was selected and used by the Heidencamp Mirror Company in accordance with this custom. In furtherance of this understanding, the Heidencamp Company kept inspectors, whose duty it was to select and inspect the cars for shipping their products. One of them testified as follows:

"My duty was to inspect the cars to be loaded with glass by the Heidencamp Mirror Company, and to have supervision of the loading,    *   *   *    and to reject any cars unfit for loading glass."

Another testified that he was the yard foreman of the Heidencamp Mirror Company, and—

"My duties as yard foreman for this company is the loading of cars—seeing to everything that goes in and out. I do not remember the shipping of a car loaded with glass to Edward Frohlich Glass Company, at Toledo, Ohio. I load too many cars to remember each one. My duties include the inspection of cars, or the repairs, if any are necessary, before shipments are made. If the car is unfit for loading glass in any way, I report it, and reject it. It was part of my duty in August, 1902, to use cars from the railroad company, if any were needed in the business of the mirror company.

"Q. What was your custom about using cars which came in on your siding loaded with material consigned to the mirror company, and which you wanted to use? A. Mr. Agan told me that I could take Pennsylvania cars to load either east or west without asking express permission, and this is what I have been doing."

The freight agent for the defendant testified:

"The general custom was for me to allow them to take P. R. R. cars to load east and west for shipments that were suitable for them. The only express request that was necessary was where it was a foreign car which could be loaded only in one direction, and which belonged to other roads, and which must be loaded in the direction of

the home route.    There was no express request for this particular car."

The clerk for the defendant at Springdale testified :

"My duties at that time were to keep record of the cars on the siding, and to look after the cars, and to see if they were in good condition.    *   *   *   If we find a car in bad condition, we mark it in the book.    The inspection I make of the cars is that I take just a quick glance at them.    I look inside of it generally to see if it is loaded.    If I find a car in bad condition in any way, I mark the car in a bad condition in the book, and what the trouble is, and report it to Mr. Agan."

The above is all the testimony bearing upon the question.    The sole act of negligence relied upon is that the defendant furnished an unfit car.    The defendant requested the court to direct a verdict for it.    This was refused, and the case left to the jury under the instructions, which will be found printed in the margin.[1]

---

[1] " This is an action or suit where the plaintiff claims damages by the negligent act of the defendant in furnishing a car that failed to bear up a package of glass which they claim tipped over and broke.

" I will first call attention to what I believe to be the law of the case, and then a moment to the facts of the case; and why I call attention to the law of the case is this:

" It is held in 22 Wallace—that is, the United States Supreme Court Report—page 123 in the *Pratt Case* (reading a part from the head-note 2) :

" ' If there is competent evidence of such a contract of a character to put before the jury, the weight, force, and degree of evidence is not open for consideration by the court.'

" That is, it means you should judge of the weight of it.    I will read another paragraph in the same case:

" ' If a common carrier [that would be a railroad company] by rail is negligent and careless in furnishing cars, and shall furnish cars unsuitable for the case, even though they be cars for cattle, which cars the owner himself sees, and which cattle the owner himself attends [that is, where he goes along with them], a common carrier [that would be the railroad company] is not relieved from responsibility, even though there have been an agreement that it should not be responsible.'

" That is, they will not allow a company to contract that they will not be responsible if they are in fact.

" A little more from the same case.    They say here, in summing

*Angell, Boynton, McMillan & Bodman,* for appellant.
*Wilkinson & Younglove,* for appellee.

GRANT, J. (*after stating the facts*).  1. In a well-considered case by this court it was held that the consignor is the agent of the consignee in the shipment of goods, and that whatever contract he (the consignor) makes with the common carrier is binding upon the consignee. *McMillan* v. *Railroad Co.*, 16 Mich. 79, 118.  It was there said that the authority of the consignor to enter into special contracts with the carrier is to be presumed, and the carrier is under no obligation to inquire into it.  The same rule is held in *Ryan* v. *Railway Co.*, 65 Tex. 13, where many authorities are cited.

Upon the record now before us, there was an agreement between the Heidencamp Mirror Company and the defendant that the mirror company, from among the cars delivered to it upon its side track, might select such as it should deem fit and suitable in which to ship its glass.  There is nothing in this agreement contrary to public policy.  The

up the *New York Cent. R. Co.* v. *Lockwood,* 17 Wall. 357, that the following propositions were established.  These propositions that I am about to read were established in the case we are talking about; that is, I mean, in the case I am reading about:

"*First.* That a common carrier cannot lawfully stipulate for exemption from responsibility, when such exemption is not just and reasonable in the eye of the law.

" *Second.* It is not just and reasonable, in the eye of the law, for a common carrier to stipulate for exemption from responsibility for negligence of himself or his servants.  You see, they cannot even stipulate to cover negligence of their own.

" *Third.* In this case he might have gone much further than he did, and find, if the company had been careless and negligent in furnishing cars, they should not be relieved from responsibility for it, although it might be found that they were liable therefor.

" I am requested to charge you, and do charge you, this.  Well, I will read their requests first.  On the part of the plaintiff, I am requested to charge you, and do charge you— And what I read from their manuscript will be considered the same as though I read from a lawbook, and be adopted by the jury.  I believe it to be the law.  So far as you are concerned, it will be the same as though I read it out of the Reports.

mirror company knew the character and weight of the products it shipped, knew what kind of cars were suitable for that purpose, and agreed to assume the risk of selecting. Every freight car is not suitable for the transportation of all kinds of products. A car suitable for the shipment of sand is not necessarily suitable for the shipment of cases filled with glass, and very heavy. An old coal car, suitable for shipping coal or like material, is not necessarily suitable for the shipment of glassware. There was no guaranty on the part of defendant that all its cars were suitable, in form or structure, for the shipment of glass. Under the agreement the mirror company undertook to select such cars only as were suitable for its purpose. The plaintiff and consignee, under this record and the authorities above cited, were bound, under this agreement, by the acts of their consignor, the Heidencamp Mirror Company. If it selected a car unsuitable for the transportation of the goods sold, the only remedy for the consignee is against the consignor.

If this car had been furnished at the express request of

---

" I charge you that, under the plaintiff's evidence in this case, you would find a verdict for the plaintiff for the sum of $470, taking their evidence. That is their claim. That is their side of the case.

" I charge you that the testimony is uncontradicted that the car in which the glass was transported was a defective car, and not such a one as the company were carrying glass in.

"There is no evidence in this case that the Heidencamp Mirror Company had any notice or knowledge of the defective condition of the car, and that there is proof that the defendant company or inspector or agent had opportunities, and did examine the car before it was loaded. Whatever examination that was, is for the jury.

"I charge you that the testimony is undisputed that the plaintiff used the ordinary appliances for unloading the car—that is, such as they had used before; the same appliances which had been used before and since without accident—and that he was without negligence in using the usual appliances for unloading the car.

"I charge you that if the Pennsylvania Company, through its agents, by proper care, might have discovered—by ordinary care might have discovered the condition ordinarily of this car—then

the consignor, and the defendant, knowing the purpose for which it was to be used, had furnished the car in response to such express request, the defendant would have assumed all liability for defects, and would not be permitted to say that the defects were open to the knowledge of the shipper, who therefore assumed the risk.

The rule applicable in the case before us is thus stated by the text-writers:

" Where the shipper exercises his own judgment, is not deceived or misled by the carrier, and chooses a car for the transportation of his property, the carrier is not answerable for the sufficiency of the car, for in such a case he does not trust to the carrier, nor rely upon the duty of the carrier, but, on the contrary, freely exercises his right of choice, and relies entirely upon his own judgment, so that there is no reason for affirming that the carrier was guilty of any wrong." 4 Elliott on Railroads, § 1480.

Hutchinson on Car. § 295 c; *Chicago, etc., R. Co.* v. *Van Dresar,* 22 Wis. 511; *Ross* v. *Railroad Co.,* 49 Vt. 364; *Harris* v. *Railroad Co.,* 20 N. Y. 232; 6 Cyc. 385.

---

the defendant would be liable for damages that arose by use of the same.

"If the car in question was unfit for the purposes to which it was applied, and if the unfitness was of such a character as to imply a fault on the part of the company or its agents in allowing it to be used, then the company would be responsible.

"I will put that in another way: Negligence—and this would be like an action for negligence—negligence, as defined in our State, is the doing of some act by a party which one of ordinary care and prudence would not do; doing something that is not carefully done—ordinarily and prudently done—or leaving undone something which an ordinarily prudent and careful person would not leave undone. Now, see what I mean by that. Leaving undone would be leaving an open well, or an opening somewhere that people might get into without some notice. Doing what they should do would be to take the affirmative; to take the burden and give notice. Transportation, we will say, on these street cars—when we get on we have a right to presume that they are whole; that they will not blow up; that there is no broken machinery in them that will throw us off the track. Affirmatively, the company who undertake to carry us, our horse, or our stuff—affirmatively they assume they

Under this record, it was error not to give the following request:

" If the shipper seizes a car which has been delivered to it loaded with sand, and, on its own account loads it with a commodity for which it is unsuitable, and damage to the goods results, the railroad company is not liable on the ground of negligently furnishing an unsuitable car."

The learned counsel for plaintiff cite and rely upon *Hunt* v. *Nutt*, (Tex. Civ. App.) 27 S. W. 1031. They say that case is on all fours with this. The consignor in that case shipped a car load of meal. He asked for a car for the purpose. The car was furnished. It was, to all appearances, suitable. The meal was in fact damaged by some substance that smelled like creosote or " sheep dip." The company in that case furnished the car. Something had been previously shipped in it which caused the damage. The shipper had no choice of selection, had not agreed to inspect, and the defect was a hidden one. It is clear that the railroad company was liable.

In *Pratt* v. *Railroad Co.*, 102 Mass. 557, a specific car,

---

will do it with the ordinary care; with the ordinary prudence of ordinary people.

" Now, if the goods in question had been bottled goods, whether any kind of bottled goods put up in cases and different boxes, and it should turn out that the packing was not suited to bottled goods —they broke by reason of the bad packing—then the fault would be the packer, or, if the breaking of this glass had been traced to the actual packing of the boxes, then the fault would be the shipper or packer. But you have a peculiar case here. We have a case here where the buying itself is a little remarkable—where the buying makes the buyer liable from the time it is loaded on the car away down there at the purchasing place. Where the seller delivers the goods, whether it be a bale of cotton or wool, or a case of clothing, or a barrel of oil, or whatever it is, he delivers the goods before he gets any pay. But here the purchase is made away down in Pennsylvania, and the buyer, Frohlich & Co., assumed all the risk.

" Well, now, their duty is to be careful—to use ordinary care— but I call your attention to this: The Pennsylvania Railroad Company furnished cars; knew the nature of the business going on, the mirror business, the glass business, the shipping business. It must

at the shipper's request, was furnished to plaintiff for a specific purpose. It was defective. It was important to the plaintiff to ship his stock at once, rather than wait a week for better cars. He used the one furnished. It was defective, and there was evidence tending to show that he knew it. The court held that the carrier was bound to furnish a suitable car, and was not exonerated from liability, even though the plaintiff knew it to be defective, accepted and used it. It was said:

"Nothing less than a distinct agreement by the plaintiff to assume the risk would have that effect."

It was also said:

"If the plaintiffs expressly agreed to assume the risk of defective cars, rather than wait a reasonable time for other cars, they cannot recover."

This case was affirmed by the Supreme Court of the United States. *Railroad Co.* v. *Pratt*, 22 Wall. 123.

---

have had some knowledge of that kind of business. Just as they knew in the case I mentioned this morning, in the Armory case— The Wabash knew that he was taking trunks over their line. They knew that they were sample trunks. They knew that they had samples in them, for they knew that they were not hand baggage, with a few shirts and drawers and collars, and the like, and they knew that they were sample cases, and that they have to care for the cases, with a view of their value in that way. So this railway knew that this was a glass business, and that any of the cars they put in the yard suitable for glass. That was some knowledge what they were to be used for. This is a peculiar case about that. They took a sand car, when they had sand in it, and loaded it up with glass. A little more: You will not need to dispute among yourselves about the utter and absolute unfitness of these cars, because that is conceded. The young men arguing the case say it was unsuited.

"You will ask yourselves— About the first thing you do, after you have elected your foreman, you will ballot on one question—guilty or not guilty of negligence. If guilty of negligence— I mean the defendant, I am talking about, because you can take a ballot either way. You can take a ballot for plaintiff or defendant. You can take a ballot on the negligence, guilty or not guilty, and then you can take a ballot of what is the amount due. I am not going to tell you how much is due. That is for the jury. I will not tell you

If there had been other cars, and the plaintiffs in that case had been authorized to inspect and select one that was suitable, and they had chosen one that was unsuitable, the obvious conclusion is that the court would have held the carrier not liable, provided the defects in the car selected were obvious. We are therefore of the opinion that the selection by the Heidencamp Mirror Company of unsuitable cars is binding upon it and its consignees, and that defects in cars suitable per se, which were so open as to be easily discernible upon inspection, were assumed by the plaintiff through the acts of its consignor.

2. The record in this case suggests another important question, but, as the case does not appear to have been tried upon that theory, and is not fully presented here, we decline to pass upon it. It is this: Assuming that the car upon which the goods were shipped was suitable in character and structure, and proper for use in the shipment of such goods, but was unsuitable and unsafe in

---

which side is negligent. That is a matter for you to consider. Consider all the circumstances, like candid men, and say, if you find for the plaintiff, the verdict is $474, as I understand it, in round numbers. That figures interest and all. If you find for the defendant, it would be no cause of action. That is the way I figure it. Still there is some testimony that the claim was presented for $360. I leave that to the jury.

"*Mr. Wilkinson:* There is no testimony of that kind, but the statement of counsel, entirely unsupported by the evidence.

"*The Court:* I will put it this way, then: You will either find a verdict for the plaintiff for $474, or find a verdict of no cause of action. That is entirely for you now. Follow an officer.

"*Mr. Bodman:* There were some requests—

"*The Court:* I marked them.

"*Mr. Bodman:* I want to take the customary exceptions. I want to take an exception to the refusal of the court to charge as requested by the defendant in its 1st, 2d, 3d, 4th, 5th, 6th, and 7th requests to charge. I except also to the charge as given by the court as a whole, and to each and every part thereof, and particularly to the giving of such of the plaintiff's requests as were given.

"*Mr. Wilkinson:* I want to except to the refusal of the court to give the 1st, 3d, 4th, and 5th requests to charge as given, and to the charge of the court as a whole."

consequence of hidden defects, such as decayed flooring, or flooring of insufficient strength, would the. defendant, under such circumstances, be liable ?  Or, perhaps, better stated thus:  Did the arrangement for selection and inspection between the Heidencamp Company and the defendant impose upon the consignor the responsibility for hidden defects in cars otherwise suitable ?

Reversed and new trial ordered.

The other Justices concurred.