HOME INSURANCE COMPANY *v.* NEW YORK
CENTRAL RAILROAD COMPANY.

CARRIERS—CONTAMINATION OF PAPER PULP—EQUALLY DIVIDED COURT.
Judgment for plaintiff consignee in action against carrier for
contamination of shipment of photographic paper pulp is af-
firmed by an equally divided court.

Appeal from Kalamazoo; Fox (Raymond W.), J.
Submitted April 4, 1963. (Calendar No. 24, Docket
No. 49,707.) Decided December 5, 1963.

Case by Home Insurance Company and United
States Fire Insurance Company, subrogee of Lee
Paper Company, a Michigan corporation, against the
New York Central Railroad Company for damages to
shipment occasioned by use of improper railroad
car. Verdict and judgment for plaintiffs. Defend-
ant appeals. Affirmed by an equally divided court.

*Stratton, Wise, Huston, Early & Starbuck
(Charles E. Starbuck,* of counsel), for plaintiffs.

*Larry C. Carl* and *Paulson, Bennett & Palmer,*
for defendant.

KELLY, J. *(for reversal).* Plaintiffs, as subrogees
of Lee Paper Company, instituted suit in the Kala-
mazoo county circuit court to recover damages for

REFERENCES FOR POINTS IN HEADNOTE
5 Am Jur 2d, Appeal and Error § 902.

defendant's negligence resulting in contamination of photographic paper pulp during shipment over defendant's railroad.

The pretrial statement contained the following: "The subrogation is agreed to, and if plaintiffs are entitled to judgment their damages are agreed to be $4,275.55."

A jury verdict was returned for the stipulated amount, and defendant appeals claiming (1) that the evidence presented at the trial was not sufficient to justify submission to the jury the question of defendant's negligence, and (2) that plaintiffs did not sustain their burden of proof that the shipment of pulp was delivered to defendant carrier in good condition.

Lee Paper Company (hereinafter referred to as Lee) purchased the pulp in question from a Norway manufacturing company who transported same to South Haven, Michigan, in 2 ships—the Makefjell, arriving in May, 1957, and the Ravnefjell, arriving in August, 1957.

Lee stored this pulp in the South Haven Terminal Company's (hereinafter referred to as Terminal) warehouse until Lee would request shipment of same to its Vicksburg, Michigan, plant.

On or about April 7, 1958, Terminal loaded car CNW and car LV with Lee's pulp. Lee made no inspection as to the condition of the pulp at the time of Terminal's loading but a chemist's inspection was made upon arrival at its Vicksburg plant and, as a result of said chemical analysis, refused to accept the pulp in car CNW because of sulphur contamination.

Previous to this April, 1958, shipment, Lee had been troubled with sulphur contamination involving shipments by truck and boat of "goods (pulp) that were contaminated in the manufacture of the goods."

Lee had warned those it dealt with in regard to pulp, including its warehouseman (Terminal), of the danger of sulphur and other contaminations, and Lee's purchasing agent testified that Terminal "was very much aware of that, of our problems."

Previous to the April, 1958, shipment, which resulted in subrogees seeking damages from defendant, Lee gave no such warning to defendant. After the April, 1958, shipment now in dispute, Lee's purchasing agent set up a new procedure and, because inspection of box cars would not disclose sulphur contamination, Lee's chemists inspected defendant's cars before loading and if found to be free of contamination, defendant would "press them into what we refer to as shuttle service." This new procedure Lee found to be an effective way to combat their contamination problem.

In the record presented to us, the only reference to any requirements that were made known to defendant is the testimony of defendant's retired freight agent, as follows:

"*Q.* When cars were requested to load this paper pulp, what sort of cars were requested by the South Haven Terminal Company?

"*A.* They requested clean cars. Good, clean cars";

the testimony of Terminal's vice-president and secretary that:

"*Q.* And when you order those cars from the New York Central Railroad Company, how do you order them?

"*A.* A clean car for Lee,"

and the testimony of Terminal's foreman, who supervised the loading of all freight cars from Terminal's warehouse for Lee, that:

"*Q.* When you order a car for this pulp for the Lee Paper Company, how do you order it? What do you say?

"*A.* I order good clean car for Lee Paper Company."

Defendant's station agent testified that he furnished what he believed to be clean cars because he knew from previous experience that if the cars did not meet Terminal's requirement after inspection, it rejected same and he would have to furnish another car; that the car in question was a new car, a red car, that he believed to be a clean car.

Terminal's loading foreman confirmed the station agent's testimony that cars had to meet his inspection approval or they were rejected and the car in question, namely car CNW, he testified, was swept out thoroughly before loading. His testimony discloses that he stated unequivocally that he believed it to be a clean car before loading, and the record shows that plaintiffs' attorney did not endeavor to question him in that regard.

The law is well established, and there is no dispute in this appeal, that in order to recover plaintiffs must meet their burden of proving that the shipment of pulp was delivered to defendant carrier in good condition.

Appellees, claiming they established a "prima facie" case, state: "It is the contention of the appellee that while the proofs were not conclusive, they were such as to provide the jury with a basis upon which to make a reasonable inference that the goods were, in fact, delivered to the carrier in a good condition and were received in a damaged condition."

The trial court, in his opinion denying defendant's motion for judgment notwithstanding the verdict, gave as his only reason for concluding there was "some evidence from which the jury might infer that the contamination must have occurred from the condition of the CNW car," stated:

"The third reason assigned is that there is no evidence that the pulp was in good condition when delivered to the railroad and in contaminated condition when it arrived at plaintiff's mill. The car in question was the CNW car. In this car was loaded pulp in bales from each of 2 ships. In the LV car, which was hauled at the same time, all of the bales were from 1 of the ships. Both the CNW and the LV car were loaded from the same warehouse in South Haven. After these 2 cars were shipped out, there were 450 bales left in the warehouse which was shipped out on April 11, 1958. There was then no more pulp from these 2 ships in the warehouse. The fact that the CNW car in question contained the only pulp from the 2 ships in question which was contaminated is some evidence from which the jury might infer that the contamination must have occurred from the condition of the CNW car. There was no contamination in the LV load which was transported in the Ravenfjell. The defendant's argument seems to be that plaintiff has failed to prove that there was no contamination in the Makefjell shipment. The fact that no other bales of the Makefjell were contaminated is evidence which the jury might consider."

No testimony was introduced in regard to the manufacture of the pulp; as to whether the pulp was manufactured at the same time, or even by the same process. There is no testimony introduced to show how long before shipment from Norway that the goods were manufactured. No testimony is in this record to show the condition of the pulp as it was unloaded from the ship or, in fact, at any time while in the storage at the South Haven Terminal Company.

Appellant states:

"Plaintiffs rely on the testimony of an employee of the paper company who saw a certain amount of 'muss' on the floor of the car when it was in-

spected 6 days after arrival. They claim that this testimony is sufficient to establish that the car was unfit for the transportation of pulp despite the positive testimony of witnesses who saw the car before it was loaded, and who testified the car was clean. Certainly this testimony does not prove that the railroad furnished an unsuitable car. The most that can be claimed for such testimony is that it permitted the jury to speculate that the car was unfit for transportation at the time it was loaded. Plaintiffs' claim that the car was contaminated by sulphur is not substantiated by the evidence. Even if the testimony of plaintiffs' witnesses was sufficient to establish that sulphur was present in the car at the time it was unloaded, such testimony does not show that the car was unfit for transportation when delivered to the shipper at South Haven. Other equally plausible explanations for the presence of any foreign substance in the car are: (1) That it was on the wrappings of the paper while in storage and fell to the car floor in transit; (2) It was tracked into the car by employees of the South Haven Terminal Company or employees of the Lee Paper Company; and (3) It was inserted there intentionally. Certainly a jury should not be permitted to disregard the positive testimony of witnesses who inspected the car before it was loaded and substitute speculative testimony on an issue as important as defendant's negligence."

Appellees, stating appellant had the duty to provide "suitable cars," cite CL 1948, § 462.8 (Stat Ann § 22.27), which provides:

"Every railroad shall, when within its power so to do, and upon reasonable notice, furnish suitable cars to any and all persons who may apply therefor, for the transportation of any and all kinds of freight in carload lots."

Appellant quotes 9 Am Jur, Carriers, § 338, pp 632, 633, as follows:

"The general rule appears to be that under ordinary conditions carriers are not required to furnish cars of a type to meet every shipper's peculiar needs or conform to his particular facilities, but that the burden is upon the shipper to adapt himself and his facilities to the use of such equipment as is demanded and used by shippers in general."

Appellant further states,

"We respectfully contend that there is no evidence in the record that the defendant and appellant contracted to furnish any car which was wholly free from sulphur or any other contaminating substance as the defendant and appellant had no actual knowledge as to what substances would contaminate and render useless photographic pulp involved as the subject matter of this action."

Appellees' amended declaration states "that it was the practice and that the South Haven Terminal Company did on or about this date specify to said New York Central Railroad that said cars were to be used for the transportation of photo brand wood pulp and that the cars furnished could not be contaminated by sulphur or any other light-reflecting chemicals which would make the pulp unsuitable for use by the Lee Paper Company; that said request and specification for the furnishing of cars was an invariable custom and practice and the specifications for 'clean' cars was invariably set forth," and we note that appellees' final sentence of their final brief, being reply brief for plaintiffs and appellees, states: "The carrier must have realized the importance of an uncontaminated car by the repeated requests for 'a clean car for Lee.'"

We considered a railroad's responsibility when the consignor, as agent of plaintiff-consignee, had the right to inspect and pass judgment on the fitness of defendant's railroad car in *Frohlich* v. *Pennsyl-*

*vania Co.,* 138 Mich 116 (110 Am St Rep 310, 4 Ann
Cas 1140).   Here Frohlich purchased a carload of
plate glass from Heidencamp Mirror Company, who
shipped the glass in defendant's car from its Penn-
sylvania plant to Frohlich in Ohio.   The glass was
damaged and Frohlich sued the railroad alleging it
furnished "an unfit car."   In reversing judgment for
plaintiff, we stated (pp 120, 122):

"Upon the record now before us, there was an
agreement between the Heidencamp Mirror Com-
pany and the defendant that the mirror company,
from among the cars delivered to it upon its side-
track, might select such as it should deem fit and
suitable in which to ship its glass.   *   *   *

" 'Where the shipper exercises his own judgment,
is not deceived or misled by the carrier, and chooses
a car for the transportation of his property, the
carrier is not answerable for the sufficiency of the
car, for in such a case he does not trust to the car-
rier, nor rely upon the duty of the carrier, but, on
the contrary, freely exercises his right of choice, and
relies entirely upon his own judgment, so that there
is no reason for affirming that the carrier was guilty
of any wrong.'   4 Elliott on Railroads, § 1480."

In the present case, as in *Frolich,* there was an
agreement between defendant and Terminal that
Terminal should "select such as it should deem
fit."

In the present case, as in *Frohlich,* Terminal was
the agent of Lee; Terminal made its inspection, and
Terminal, on this record, stated the car it loaded
was not an unfit car but was a suitable car.   Ter-
minal asked for a clean car and Terminal states it
received such a car from defendant.

The South Carolina supreme court in *Gramling
Electric Refrigeration, Inc.,* v. *Southern R. Co.,* 155

SC 394 (152 SE 670), considered an action to recover damages to a crated refrigerator shipped over defendant's line. Positive proof was introduced that the refrigerator was in good condition when crated at Schenectady, New York. It was then shipped by rail to New York City where it was placed on a boat and shipped to Jacksonville, Florida; thence by rail to Atlanta, Georgia, where it was stored in a warehouse until delivered to defendant for shipment over its railroad. A jury verdict for plaintiff was reversed by the South Carolina supreme court on the grounds that plaintiff had failed to show that the goods were delivered to defendant in good condition, and the South Carolina court stated (pp 398, 399):

"The evidence is that the shipment was twice broken, at Jacksonville and Atlanta, and there is no evidence showing its conditon at either point. * * * What happened to it along this interrupted journey and a lapse of considerable time is a matter of conjecture, as there is no evidence of its condition at any 1 of these various stages."

In the present case, the presence or absence of sulphur in the pulp from the time of manufacture until and including the time of delivery to either Terminal or defendant is a matter of conjecture.

Lee took every precaution to see to it that the contaminated pulp did not enter its premises, but seemed strangely indifferent as to the condition of the pulp as it was placed on the boat; as it was unloaded from the boat and placed in Terminal's possession; as it remained in Terminal's possession, or as to its condition when it was delivered to defendant.

This record does not show that defendant furnished an unfit car, but, to the contrary, shows that

defendant furnished a car that Terminal approved as fit and suitable.

Plaintiffs failed to meet the burden of proof that the goods were in good condition when delivered to defendant and plaintiffs failed to prove defendant's negligence.

Defendant prays for the following relief: "That this Honorable Court reverse the decision of the trial court which denied defendant's motion for judgment notwithstanding the verdict, and direct the trial court, accordingly, to enter such judgment notwithstanding the verdict." That prayer for relief should be granted.

The case should be reversed and remanded for entry of judgment for defendant. Costs to appellant.

CARR, C. J., and DETHMERS and O'HARA, JJ., concurred with KELLY, J.

BLACK, J. (*for affirmance*). I am unable to sign the opinion Justice KELLY has proposed. In it he marshals all arguments, the tendency of which is persuasion that there is a paucity or weakness, rather than a total insufficiency, of proof supporting the plaintiffs' cause. But that is not the right way, as the opinions of this Court have disclosed with renewed force in recent years, to test the validity of a motion for entry of judgment notwithstanding verdict.

The controlling question is whether there is any proof, looking at the testimonial record with due favor to the cause of the party against whom the movant would have judgment, upon strength of which the jury was legally authorized to find as it did. I find by such test that there is such proof, as did the trial judge.

Justice Kelly has·quoted a portion of the trial judge's opinion denying defendant's motion for judgment notwithstanding verdict. Here, as I read it, is the more crucial part of Judge Fox's opinion:

"It is the opinion of the court that there was a question of fact for the jury. As the court will indicate later in this opinion, it is the opinion of the court that there was evidence from which the jury might find that the pulp was in good condition when delivered to the railroad, and there was evidence from which the jury might find that upon its arrival in Vicksburg it was contaminated, and there was a question for the jury whether or not such contamination resulted from the movement of the pulp from South Haven to Vicksburg in a car furnished by the defendant railroad.

"As to the claim of the defendant that no negligence was proven on the part of the carrier, the testimony revealed that the plaintiffs ordered a good, clean car. As the court will indicate later, there was testimony from which the jury could find that the pulp was in good condition when delivered to the defendant, and there was testimony to the effect that it was in a contaminated condition when it was unloaded at the plaintiff company. There was testimony as to the sweeping out of the car in question, but it is quite obvious from the testimony that the mere sweeping of the car in and of itself would not free it of contamination because of the very peculiar nature of the commodity being transported and the very marked effect upon the pulp by a relative minute quantity of sulphur. There was, in the opinion of the court, testimony from which the jury could find that upon the arrival of the pulp at Vicksburg, Michigan, at plaintiff's mill, sulphur or a sulphur substance was found on the floor of the car. * * *

"It is true that because of the absence of 1 witness, plaintiff's proofs were not as strong as they perhaps could have been. Nevertheless, there was testimony

that a Mr. Kite was seen holding a bottle at the CNW car which contained some yellow material in dirt. There is testimony that witness Heikes ran a test on material brought in by Kite which looked like sulphur, which melted as sulphur, and which when burned burned blue and gave off sulphur dioxide gas. There was also testimony that witnesses Christian, Smalley and Stroud and Kite went to the car in question, that the witness Christian saw sulphur removed from cracks in the floor, that it was small, granular; that Kite was holding a bottle; and witness Christian further testified that he saw the burning test and smelled the sulphur. Witness Smalley testified to the finding of yellow materials in the cracks in the car and that he had seen sulphur before, and that he saw signs of sulphur in the cracks in the floor of the car in question. There was testimony as to the susceptibility of this pulp to contamination by sulphur."

I am quite sure that *Frohlich* v. *Pennsylvania Company*, 138 Mich 116 (110 Am St Rep 310, 4 Ann Cas 1140), upon which Justice KELLY depends principally for entry of judgment in favor of the defendant carrier, is authority against rather than for entry of such judgment. The undisputed as well as decisive fact of *Frohlich*, wholly absent here, is that by agreement of consignor and carrier the consignor was to make its own selections of cars desired for its shipments of glass, and that it did so in the instance out of which the suit arose. This was made clear by the Court (pp 120–122):

"Upon the record now before us, there was an agreement between the Heidencamp Mirror Company and the defendant that the mirror company, from among the cars delivered to it upon its side track, might select such as it should deem fit and suitable in which to ship its glass. There is nothing in this agreement contrary to public policy. The mirror company knew the character and weight of

the products it shipped, knew what kind of cars were suitable for that purpose, and agreed to assume the risk of selecting. Every freight car is not suitable for the transportation of all kinds of products. A car suitable for the shipment of sand is not necessarily suitable for the shipment of cases filled with glass, and very heavy. An old coal car, suitable for shipping coal or like material, is not necessarily suitable for the shipment of glassware. There was no guaranty on the part of defendant that all its cars were suitable, in form or structure, for the shipment of glass. Under the agreement the mirror company undertook to select such cars only as were suitable for its purpose. The plaintiff and consignee, under this record and the authorities above cited, were bound, under this agreement, by the acts of their consignor, the Heidencamp Mirror Company. If it selected a car unsuitable for the transportation of the goods sold, the only remedy for the consignee is against the consignor.

"If this car had been furnished at the express request of the consignor, and the defendant, knowing the purpose for which it was to be used, had furnished the car in response to such express request, the defendant would have assumed all liability for defects, and would not be permitted to say that the defects were open to the knowledge of the shipper, who therefore assumed the risk."

In the case before us plaintiffs' theory was and is quite the other way. That theory was supported by some testimony, a part of which Justice Kelly has quoted. Such testimony established prima facie that the terminal foreman, in charge of loading cars for the plaintiffs' assignor, Lee Paper Company, repeatedly warned the defendant carrier that Lee Paper must have "clean" cars; also that the defendant carrier's station agent ordered, as needed, "clean cars for loading pulp to Vicksburg" (referring to Lee Paper shipments). In these circumstances it

seems to me that the reverse rule, declared by *Frohlich's* "if" paragraph above, was validly brought into play.  Note how *Frohlich* was expressly distinguished, in *Ginsberg* v. *Wabash R. Co.,* 219 Mich 665, 675 (28 ALR 518) from the typical instance where —as the jury found here—the carrier has provided a defective car it, the carrier, has selected for the shipper's known need and purpose.

As I read the testimony and the opinion of Judge Fox, the specific question before us—whether the trial judge would have been justified in overturning the jury's verdict—is controlled by the general rule, found with copiously cited authority in *Chesapeake & O. R. Co.* v. *Thompson Manfg. Co.;* 270 US 416, 422, 423 (46 S Ct 318, 70 L ed 659).  Such rule is that where a plaintiff shipper introduces evidence showing delivery to the carrier of a shipment in good condition and delivery to the consignee in bad condition, such plaintiff has made out a prima facie case.  As properly held below, some proof of each such element was adduced by plaintiffs.

Upon required favorable view I conclude:  (a) That there is some proof that the defendant carrier agreed to provide "clean" cars for Lee Paper shipments; (b) That there is some proof that its agent knew the reason and the need for such "clean" cars, and (c) That there is some proof that the CNW car supplied by the defendant carrier was not "clean" as agreed.  Such holding calls for affirmance.  My vote is cast accordingly.

KAVANAGH and SOURIS, JJ., concurred with BLACK, J.

SMITH, J., concurred in affirmance.