GINSBERG *v.* WABASH RAILWAY CO.

1. CARRIERS—NEGLIGENCE—DUTY TO FURNISH PROPER CAR—CONTRACT AGAINST LIABILITY FOR FURNISHING DEFECTIVE CAR INVALID.

The duty to furnish a proper car rests upon the carrier and not upon the shipper, and the failure to discharge this duty is negligence, from the consequences of which the carrier may not free itself by contract or otherwise.

2. SAME—CONTRACT AGAINST LIABILITY FOR DEFECTIVE CAR INVALID —INTERSTATE COMMERCE COMMISSION.

In so far as any of the provisions of the uniform live stock contract between shipper and carrier contravene the settled principles of common law preventing a carrier from contracting against liability for loss caused by its own negligence, it gains nothing from being filed with the interstate commerce commission.

3. SAME—FURNISHING DEFECTIVE CAR NOT ASSUMED BY SHIPPER.

Where a shipper of a car load of horses noticed, after the car was loaded, that it was in a defective condition and asked for another car, whereupon he was told by the carrier's agent that no other car could be furnished and assured that the horses would be all right in that one, the car was not one of the shipper's choosing and the carrier was not thereby relieved of liability for damages resulting from said defective car.

4. SAME—CONSTRUCTION OF CONTRACT—INTERSTATE COMMERCE.

The construction of a contract for an interstate shipment is a Federal question.

5. SAME—CONNECTING CARRIER LIABLE WHERE USING DEFECTIVE CAR.

In an action against a railroad company by a shipper of a car load of horses for damages resulting from the furnishing of a defective car, the fact that the car was furnished defendant by a connecting carrier does not relieve it of responsibility, since by accepting and using it

On statutory duties of carriers of live stock with reference to care of stock during transportation, see note in 44 L. R. A. 449.
On liability of carrier for damages to freight because of defects in or improper condition of car, see note in L. R. A. 1917C, 510.

defendant rendered itself liable for any negligence in its use.

6. SAME—JOINT TORT FEASORS LIABLE FOR ALL DAMAGES.

If through the use of a defective car plaintiff's horses were unduly exposed to the elements and injured while en route, plaintiff would not be required to separate the injury into parts between the connecting carriers, for as joint tort feasors each would be liable for all damages which resulted.

7. SAME—EVIDENCE—SUFFICIENCY.

In view of the testimony of defendant's agent for unloading at destination that when he went into the car he saw it was or had been leaking at the roof, where there was an opening four feet long, and that soon after they unloaded the horses "it began to rain pretty hard," defendant's contention that a verdict should have been directed in its favor because there was no proof that any rain fell or wind blew during the period of transportation, nor that the wind or rain by which the horses were injured came through the hole in the roof instead of through the open slats at the bottom, is untenable.

8. SAME—NO DUTY UPON SHIPPER TO REPAIR CAR ON DISCOVERING DEFECT.

Defendant's contention that, when plaintiff discovered the defect in the roof of the car and that a window at one end was out, it was his duty to repair them if he thought them dangerous, cannot be sustained.

9. SAME—EVIDENCE—QUESTION FOR JURY.

Where the testimony was conflicting as to whether the horses were injured by exposure to the elements during transportation, as claimed by plaintiff, or whether the injury was caused by plaintiff's leading the horses through the rain to their stables after unloading, as claimed by defendant, a question of fact was presented for the jury.

10. SAME—NEGLIGENCE—UNREASONABLE DELAY—EVIDENCE — QUESTION FOR JURY.

Where plaintiff's contract called for transportation of the horses under the 36-hour rule without unloading for rest, water, and feed, and almost 40 hours were taken, the question as to whether there was an unreasonable delay, under all the circumstances shown, was one for the jury.

11. SAME—PLEADINGS—SUFFICIENCY—EVIDENCE.

Allegations in the declaration charging negligence in subjecting the horses to protracted and unusual exposure owing to the defective condition of the car and unreasonable delay in transporting them while so exposed, were sufficient to recover for neglecting to unload, feed, and water at the end of 36 hours, as required by law (34 U. S. Stat. p. 607), although failure to so feed and water was not specifically charged.

12. SAME—PROOF—INFERENCES.

In view of the fact that the law requires the shipper to pay the reasonable expense of feeding and watering en route, where the evidence shows that no bill for same was presented to the shipper it is a reasonable inference that they were not so fed, and defendant's contention that there was absence of proof on the question cannot be sustained.

Error to Wayne; Mandell (Henry A.), J.    Submitted February 2, 1922.    (Docket No. 118.)    Decided October 2, 1922.    Rehearing pending.

Case by Harry Ginsberg and others, copartners as H. Ginsberg & Sons, against the Wabash Railway Company for damages to certain horses in transit.    Judgment for plaintiffs.    Defendant brings error.    Affirmed.

*Beaumont, Smith & Harris* (*Thomas B. Moore,* of counsel), for appellant.

*Daniel J. Alpert* (*Paul J. Wieselberg,* of counsel), for appellees.

STEERE, J.    Plaintiffs are a firm consisting of Harry Ginsberg and his two sons, Charles and Sydney, engaged in the business of buying and selling horses located and having stables in the city of Detroit.    On March 30, 1917, they shipped a car load of horses, 13 in number, from Decatur, Indiana, to Detroit, where they arrived at defendant's station at the foot of 12th

street on Sunday, April 1, 1917, at about 8:30 a. m. and were at once unloaded. A member of the firm was there at the time and saw them unloaded. They were then receipted for and taken to plaintiffs' stables at 417-419 Russell street. The delivery record dated April 1, 1919, describing the shipment, charges, etc., bears the following receipt:

"Received in good order for account consignee.
"Signature, H. GINSBERG & SONS."

The horses, when unloaded, were put in a shed at the station and from there at once taken through the streets to plaintiffs' stables against the protest of defendant's foreman in charge of their unloading and delivery because, as he testified, "it begun to rain pretty hard." After arriving at the stables some of the horses were found to be in poor physical condition and a veterinary surgeon was called to attend them. He testified that he found them afflicted with colds and three seriously sick with congestion of the lungs which developed into pneumonia and resulted in their death. Several of the others had, or developed, colds and another subsequently died, but he "succeeded in curing the others."

Plaintiffs brought this action against defendant to recover damages they sustained from the sickness and death of their horses and recovered a judgment of $1,000. Their declaration alleges that they caused this car load of 13 horses to be delivered to defendant on March 30th at Decatur, Indiana, for shipment to Detroit, Michigan, and it was its duty under this contract of shipment to furnish a suitable car and "transport said horses in such manner that they would not be exposed to the elements and would be transported in a safe and sound condition," charging as negligence that defendant failed in that particular and—

"carelessly and wilfully intending to injure and defraud the said plaintiffs, would not nor did not safely

or securely carry and convey the said above described horses from Decatur, Indiana, to Detroit, Michigan, and exposed the same to the elements in that the car in which said horses were shipped was defective and broken so that the rain came into said car and said horses were exposed to the elements and to the rain while they were being shipped, and said shipment was unreasonably delayed."

Defendant pleaded the general issue with several special notices, amongst others that the movement of the horses was between States and governed by the Federal act to regulate interstate commerce, that they were transported under the provisions and according to the terms of a contract of shipment known as the "uniform live stock contract," set forth in tariffs and classifications filed with the interstate commerce commission, posted and published as required by law, that the loss if any was due to the fault and neglect of plaintiffs or the persons by whom shipment was made, that before the car was loaded at the initial point plaintiffs inspected the same and consented to its use for said transportation, and the loss or damage if any was due to plaintiffs' own negligence.

Charles and Sydney Ginsberg were at Decatur when the horses were loaded into the car which carried them to Detroit, and then gave the Chicago & Erie Railroad Company, which was the initial carrier, a written "request for handling live stock" which described the shipment and stated that under "the provisions of an act of congress to prevent cruelty to animals while in transit by railroads" they requested "that said live stock be handled under the 36-hour rule as to confinement in cars without rest, food or water instead of the 28-hour rule."  They provided no caretaker to accompany the stock, but after it was loaded went by rail to Detroit, arriving there before the horses which should get there in about 28 hours after shipment.  The Federal act under which the 36-hour

rule was requested prohibited railroads from confining live stock in transportation—

"for a period longer than 28 consecutive hours without unloading the same in a humane manner, into properly equipped pens for rest, water and feeding, for a period of at least five consecutive hours, unless prevented by storm or other accidental or unavoidable causes which can not be anticipated or avoided by the exercise of due diligence and foresight: *Provided,* That upon the written request of the owner or person in custody of that particular shipment, which written request shall be separate and apart from any printed bill of lading, or other railroad form, the time of confinement may be extended to 36 hours." 34 U. S. Stat. p. 607.

Plaintiffs claim and introduced testimony to show that the car was defective in having an opening in the roof of considerable size and a window out at one end which would permit the elements to enter and cause a draft through the car to a greater extent than the horses should be subjected to, and that they were kept confined in it by defendant during the period of transportation lasting between 39 and 40 hours without being unloaded for rest, food and water as the act required, the extra confinement and exposure without food or water resulting in their catching cold and the loss which followed. Those contentions were submitted to the jury as issues of fact.

Defendant moved for a directed verdict which was refused, and afterwards for a judgment *non obstante* which was also denied. Defendant contends under its assignments that it did not appear any injurious elements entered the car during transportation of the horses, that by the live stock contract under which they were transported defendant was not liable for loss or injury to the stock on account of heat, cold or change in the weather, and plaintiffs are precluded from recovering because they inspected and accepted

the car now claimed to be defective, by the following provision in their contract for transportation:

"The shipper shall inspect the body of the car or cars in which said live stock is to be transported and satisfy himself that they are sufficient and safe and in proper order and condition, and no carrier shall be liable on account of any loss of or damage to said live stock occurring by reason of any insufficiency in or defective conditions of the body of said car or cars which reasonably could have been discovered by the shipper."

It is urged this provision of the contract disposes of the question of a defective car in defendant's favor and the jury should have been so instructed. Charles Ginsberg testified that he ordered a car fit to ship horses in and saw the one used at the time the horses were being loaded for shipment, that it was all right at the sides but one part, or space, of the top was off and a window at the end about 2½x3 feet was out and open, that he noticed this after the horses were loaded and asked the agent to furnish another car, and he said: "Oh, they are all right," and that was the only car available. Defendant's witness, Palmer, who received and delivered the car load of horses at Detroit and walked into the car to look it over, said that it was leaking in the roof at one place, or showed it had leaked, that the place was about 6 or 8 inches wide and about 4 feet long, but he did not recall seeing any window open.

This uniform live stock contract takes the place of the customary uniform bill of lading. In so far as any of its provisions contravene the settled principles of common law preventing a carrier from contracting against liability for loss caused by its own negligence, it gains nothing from being filed with the interstate commerce commission. This car was not of plaintiff's own choosing. He was given no chance to inspect and select, but when the shipper asked for another

car he was told no other could be furnished, with assurances the stock would be all right in that one. The shipment was for a customary 28-hour run, without an accompanying caretaker of the stock, and a maximum allowance of 8 hours for possible delay under the 36-hour rule for handling the stock as authorized when so requested by the shipper. The substance of the many decisions holding it against the policy of the law to permit a common carrier to neglect its duty and escape liability by a provision in its bill of lading making the shipper a car inspector is comprehensively stated in 10 C. J. p. 90, as follows:

"It is very generally held that the duty of the carrier to furnish suitable cars cannot be evaded or its liability for failure so to do limited by a mere stipulation in the shipping contract or bill of lading devolving on the shipper the duty of selecting cars suitable for, the purposes of his shipment, or by a general stipulation that the shipper has examined the car in which the stock is shipped and accepts it as suitable and sufficient. This will not estop him from recovering the injuries due to a defective car, inasmuch as the carrier cannot limit his common-law liability so as to exempt himself from the consequences of his own negligence."

This contract was entered into at Decatur, Indiana, where it was dated and signed. Assuming that the law of the State in which the contract was made governs, we find it said in *Lake Erie, etc., R. Co.* v. *Holland,* 162 Ind. 406 (69 N. E. 138, 63 L. R. A. 948), of a similar provision in a contract where the horses were delivered at Kokomo, Indiana, for transportation to Indianapolis:

"The duty to furnish a proper car rested upon the carrier, and not upon the shipper, and the failure to discharge this duty is negligence, from the consequences of which the carrier is not permitted to free itself by contract or otherwise."

This being an interstate shipment, however, the

construction of the contract is a Federal question. In *Georgia, etc., R. Co.* v. *Blish Milling Co.*, 241 U. S. 190 (36 Sup. Ct. 541), the court said, through Justice Hughes:

"The connecting carrier is not relieved of liability by the Carmack amendment, but the bill of lading required to be issued by the initial carrier upon an interstate shipment governs the entire transportation and thus fixes the obligations of all participating carriers to the extent that the terms of the bill of lading are applicable and valid. 'The liability of any carrier in the route over which the articles were routed, for loss or damage, is that imposed by the act as measured by the original contract of shipment so far as it is valid under the act.' *Kansas City Southern R. Co.* v. *Carl*, 227 U. S. 639 (33 Sup. Ct. 391).— Citing also various other Federal decisions.

"These decisions also establish that the question as to the proper construction of the bill of lading is a Federal question."

The fact that this car was furnished defendant by a connecting carrier does not relieve it from liability. By accepting and transporting the horses therein the car became its own instrumentality for that purpose and responsibility followed for any negligence in its use of the same, as though it had furnished the car on its own initiative. If this was a defective car and through the defect the horses were unduly exposed and injured while en route, catching cold which resulted in sickness or death, plaintiff would not be required to separate the injury into parts between the carriers, for as joint feasor each would be liable for all damages which resulted. Whether or not such conditions and consequences occurred and resulted were questions of fact.

We cannot agree with the contention of defendant's counsel that a verdict should have been directed because there was no proof any rain fell or wind blew

during the period of transportation, nor that the wind and rain by which the horses were injured came through the open window and hole in the roof instead of through the open slats at the bottom with which the car was provided, nor, as is urged, that it was plaintiffs' duty to mend the roof and stop up the window on discovering these defects, if they thought them dangerous to the shipment. When another car was asked for, assurances were given that the horses would be all right in the one furnished, and had the run been made in the usual time it perhaps would have been. As to any evidence for the jury of rain, defendant's agent for unloading at Detroit testified that when he went into the car he saw it was or had been leaking at the roof where there was an opening four feet long, and that after they got the horses out into a shed "It began to rain pretty hard." The weather reports of Detroit showed rain fell between midnight and 9 o'clock of that day. Palmer testified plaintiffs took the horses away to their stables in the rain, which Charles Ginsberg denied, saying that the weather was then "nice for that time of the year."

There was testimony before the jury that these horses were healthy and in good condition when loaded on the car at Decatur, and when unloaded at Detroit they were "wobbly," in a "weakened condition" and "showed that they were all in," that they were immediately taken to plaintiffs' stables to be fed and cared for, were there discovered to be in such condition that a veterinary was sent for, who found three of them "seriously sick" with high temperatures, "breathing rapidly, had a rapid pulse and their lungs were quite badly congested," that colds which they then had or developed resulted in his treating the whole 13, 4 of them dying, and it being "some time towards the end of April" before the rest had all "made a good recovery." Whether the sickness of

all those horses and death of some resulted from plaintiffs leading them in their weakened and wobbly condition to their stables through the rain, as defendant claims, or negligence of defendant in their transportation, as plaintiffs claim, or neither, were issues of fact touching which there was evidence direct or circumstantial to carry the case to the jury.

Defendant urges as sustaining its contention *Frohlich* v. *Pennsylvania Co.*, 138 Mich. 116 (4 Ann. Cas. 1140, 110 Am. St. Rep. 310), and *Lardie* v. *Railroad Co.*, 192 Mich. 77.

In the *Frohlich Case* the shipment was a car load of plate glass consigned and shipped to him over defendant's line by the Heidencamp Mirror Co. of Springfield, Pa. The mirror company had from the carrier permission to select after unloading any car suited to its needs from amongst the various loaded cars consigned to it. It had its own inspector for that purpose, selected such of those cars as it deemed fit and loaded them out with its own merchandise, without consulting or asking permission of the carrier. Under such a state of facts the court very properly declined to hold the railroad responsible for the mirror company's mistakes in selecting and loading an improper and unsafe car for the shipment of glass. Here no opportunity was given the shipper to select. His request for another car was not granted. The carrier's agent selected the one used and assured him of its fitness for the purpose.

In the *Lardie Case* the shipment was a car load of potatoes. Plaintiff's agent ordered a refrigerator car. Defendant was unable to furnish one and he then ordered a box car, which he said would be all right, relieving the carrier of responsibility by writing on the shipping order and bill of lading "Owner's Risk Freezing," and "Box car loaded with perishable

freight at shipper's request and shipper's risk." Applying the rule in the *Frohlich Case,* the court said:

"But the stipulation in this contract does not attempt to relieve from liability for negligence. It relieves from liability for a loss which the parties contemplated might be caused by an element beyond the control of both parties, wholly unrelated to any act or omission of the carrier."

It is further contended that there is no allegation in the declaration or evidence to go to the jury that the horses were not fed and watered during their transportation. The question of sufficiency of the declaration does not appear to have been raised before the trial court, either in objection to testimony on that subject or in defendant's motion for judgment *non obstante,* neither does it plainly appear, if at all, in the numerous assignments of error. The question raised and stressed in the trial court was absence of proof. The injury to the horses is charged in the declaration to negligence in subjecting them to protracted and unusual exposure owing to the defective condition of the car and unreasonable delay in transporting them while so exposed. Want of food and water would as a matter of common knowledge and as the testimony shows reduce their vitality and increase their liability to contract colds and become sick. Defendant's delivery record showed they were fed, watered and loaded in Decatur at "5 p. m. March 30, 1917." There was a "36-hour release filed" and they were "unloaded at 8:30 a. m. April 1, 1917," at Detroit, making almost 40 hours in transportation.

Whether that time in transporting a car of horses between those points was an "unreasonable delay" under all the circumstances shown was a direct issue presented by the pleadings. The horses were being transported without a caretaker under the 36-hour rule, as the law permits. At the expiration of that

time it was the carrier's duty to unload them in a proper place for rest, water and feeding, for a period of at least 5 consecutive hours. In such case the law requires the shipper to pay the reasonable expense thereof and gives the carrier a lien therefor collectible at their destination. The freight bill according to rate specified in the live stock contract was paid by plaintiff on date of the delivery of the horses. No feed bill was presented, as the evidence showed was customary when the carrier fed the horses en route. Various circumstances connected with this shipment gave room for inference that the horses were not unloaded, rested, fed and watered while in transportation, and the court did not err in refusing to instruct the jury to the contrary. In charging the jury the court explained plaintiffs' claim as to a defective car and then took up that of "unreasonable delay," saying:

"It is further claimed on behalf of the plaintiffs that an unreasonable time was consumed in the shipment of these horses, and by reason of that the horses were found in a weakened condition; and that because of that weakened condition that, taken into consideration with the other conditions of the shipment, it caused the horses to catch cold, which developed quickly into pneumonia and, as is claimed by the plaintiffs, it caused the death of four horses and illness of the others."

Explaining the duty of a common carrier in transporting stock under the Federal law, the court said, as applied to the situation it was claimed existed here,—

"that it would be unlawful for a carrier to keep horses confined for a period exceeding 36 hours, without taking them out of the car and feeding and watering them."

The charge taken in its entirety fairly instructed the jury as to plaintiffs' two claims of negligence

charged in the declaration, and the right of the jury as bearing upon "unreasonable delay" to consider the question of whether or not the horses were fed and watered as the law required while in transportation. After reviewing those questions the court squarely put to the jury the vital issue involved as follows:

"The court instructs the jury that in order for the plaintiffs to recover they must show by a preponderance of the proof that the elements and rain which entered said car through said defective or broken place in said car, if such existed, and if the jury shall find that any elements or rain entered there did alone and solely cause the illness, death, injury or loss of use of the horses as alleged. Or, to put it as I put it in my main charge, they must find that that was the proximate cause of the injury. * * *

"It also devolves upon the plaintiffs to prove the negligence charged by a preponderance of the evidence, and in this case if the jury finds that the weight of the evidence is in favor of the defendant or is equally balanced, then the plaintiffs cannot recover, and the jury should return a verdict in favor of the defendant for no cause of action."

We are of opinion the case involved questions of fact which were fairly submitted to the jury, and find no prejudicial error demanding reversal.

The judgment is affirmed.

FELLOWS, C. J., and WIEST, CLARK, BIRD, SHARPE, and MOORE, JJ., concurred.

The late Justice STONE took no part in this decision.