No. 2353

Second Circuit

ELLERBE v. LANCASTER AND WALLACE
As Receivers of the T. & P. Ry. Co.

(November 10, 1927.  Opinion and Decree.)

*(Syllabus by the Court)*

1.  **Louisiana Digest—Carriers of Passengers and Goods—Par. 126.**

It is the duty of common carriers to furnish vehicles for the shipment of freight over their lines free from defects which might endanger the safety of the goods and which are suitable for the purpose of transporting merchandise of the character to which the contract of shipping relates.

2.  **Louisiana Digest—Carriers of Passengers and Goods—Par. 132.**

To relieve the carrier of such liability, it must appear that the shipper of the goods voluntarily selected the vehicle himself by virtue of an express contract or under circumstances which charge him with full knowledge of such defects.

3.  **Louisiana Digest—Carriers of Passengers and Goods—Par. 123.**

It is the duty of common carriers to know the condition of the vehicles which they furnish for the transportation of freight over their lines, and a shipper has a right to assume that such vehicles are free from defects and safe.

4.  **Louisiana Digest—Carriers of Passengers and Goods—Par. 124, 132.**

The mere fact that a shipper has inspected a car in which his goods are shipped and has reported to the agent of the carrier that the car is apparently in good condition, will not relieve the carrier from liability for loss or damage caused by such defects.

5.  **Louisiana Digest—Carriers of Passengers and Goods—Par. 124, 132.**

Even in cases where the shipper has voluntarily selected, after inspection, the vehicle for the shipment of his goods, the carrier is not relieved of liability where the defects are latent and not readily discoverable.

Appeal from the First Judicial District Court of Louisiana, Parish of Caddo. Hon. E. P. Mills, Judge.

Action by Clarence Ellerbe against J. L. Lancaster and C. L. Wallace as Receivers of the Texas & Pacific Railway Company.

There was judgment for plaintiff and defendant appealed.

Judgment affirmed.

Thigpen, Herold, Lee & Cousin, of Shreveport, attorneys for plaintiff, appellee.

Wise, Randolph, Rendall & Freyer, of Shreveport, attorneys for defendant, appellant.

ODOM, J. The plaintiff shipped a car of cotton seed over defendant's line of railroad from Robson station to New Roads, Louisiana, in December, 1923. The roof of the car in which the seed was shipped leaked, the seed got wet in transit, and as a result was damaged to the extent of $594.46; for which amount plaintiff brought this suit.

The defense, as set out in defendants' answer, is that:

"The shipper of said cotton seed referred to in the petition, appropriated the car for the loading thereof without the knowledge or consent of the defendants or any one acting for or under their authority; that said car was not placed by defendants, its agents or employees for the loading of cotton seed or any other commodity; that the condition of said car was apparent, as being utterly and entirely unfit for shipment of cotton seed therein, which condition was, or should have been known to the shipper and shipper's agents or employees, who loaded said cotton seed; that said car was not tendered to shipper for such shipment, but such car was used by said shipper's agents and employees without the knowledge or consent of defendants, and defendants are not liable for any damage occasioned by the use of such car for such purpose."

There was judgment in the lower court in favor of the plaintiff and the defendants appealed.

## OPINION

The facts disclosed by the record are as follows:

Robson, where the seed was loaded, is a station on defendants' line of railroad at which there is no agent. Bills of lading for freight loaded at and shipped from said point are issued by the defendants' agent at Gayle and other stations about two miles away.

In accordance with a custom of long standing and by specific instructions issued by defendants' agents and employees, parties who had freight to be shipped from the non-agency station of Robson appropriated such empty cars as might be found there, loaded their freight into them, went to Gayle and procured a bill of lading from the agent there.

Cars thus loaded, and for which bills of lading were issued, were picked up by local freight trains and transported in due course.

Plaintiff, having cotton seed to ship, found an empty box car on the siding at Robson and, according to custom, had his seed loaded therein. Whether he "spotted" or placed the car at the gin or whether that was done by defendants is not made clear by the record. It is in evidence that this was done at times by the shippers and at other times by defendants' employees.

The seed was blown into the car from the gin.

After the loading was begun and before it was finished, plaintiff went to Gayle and informed the agent that he was having a car loaded with cotton seed, whereupon the agent told him that if the car was apparently in good condition he might continue the loading. Plaintiff left and in a short time went back and told the agent that the car appeared to be in good condition. In the meantime, the agent communicated with another agent, at Lucas, a station on defendants' line, who informed him that the car had been sent to Robson loaded with household goods.

The agent at Gayle testified:

"I presumed that the car would be O. K. if it was loaded with household goods. I presumed it was all right for seed loading. "I wouldn't let a man ship household goods in a car that wasn't fit for seed; no sir."

The agent at Gayle informed plaintiff that the car had been loaded with household goods. The testimony shows that some colored people had shipped in the car not only their household goods but their farming utensils, chickens, and livestock as well.

The agent at Gayle issued to plaintiff the defendants' uniform bill of lading for the seed.

The testimony establishes beyond question the fact that the roof of the car was in bad condition and leaky and that the seed got wet and spoiled. It is established also that the condition of the roof of the car was not apparent on casual inspection, and that the only way to ascertain its condition was by viewing it from the top. There is testimony to the effect that there was a hole at or near the door of the car, which defect was apparent, and this was noticed by plaintiff; but there is no suggestion that the water which may have gotten to the seed through this hole damaged them.

Under these conditions, defendants disclaimed liability for the damage to the seed on the ground stated in their answer, as quoted above, and, in support of their contention of non-liability, cite the case of Frohlich vs. Pennsylvania Company, 138 Mich. 116, 110 American State Reports 310, 101 Northwestern 223, where the court quoted the rule as laid down by the text writers, as follows:

"Where the shipper exercises his own judgment, is not deceived or misled by the carrier, and chooses a car for the transportation of his property, the carrier is not answerable for the sufficiency of the car, for in such a case he does not trust to the carrier, nor rely upon the duty of the carrier, but on the contrary freely exercises his right of choice and relies entirely upon his own judgment, so there is no reason for affirming that the carrier was guilty of any wrong."

This rule was no doubt applicable to the case before the court, but it does not apply to the case at bar. The facts are altogether different. In that case, the consignor shipped a lot of glass in an old coal car with a drop door in the floor opening downward for the purpose of dumping the load.

The car was totally unfit for the shipping of glass. When the consignee attempted to unload the glass, a box of it fell through the trap door and was damaged. The carrier was not liable, for the damage, but the court said:

"Upon the record now before us there was an agreement between the Hudincamp Mirror Company (the shipper) and the defendant (the carrier) that the Mirror Company, from among the cars delivered to it upon its sidetrack, might select such as it might deem fit and suitable in which to ship its glass. There is nothing in the agreement contrary to public policy. The Mirror Company knew the character and weight of the product shipped and knew what kind of cars were suitable for that purpose and agreed to assume the risk of selecting."

The court said that the testimony showed that the shipper kept in its employ men whose duty it was to inspect all cars and select only such as were suitable. And the court further said:

"An old coal car suitable for shipping coal or like material is not necessarily suitable for the shipping of glassware. There was no guaranty on the part of defendant that all its cars were suitable in form or structure for the shipment of glass. Under the agreement the Mirror Company undertook to select such cars only as were suitable for its purpose."

The court had before it a case where the shipper, by agreement, was selecting the car it wanted from among those found on the carrier's track in its yard and agreed to assume the risk of selecting, and under the circumstances the carrier was not liable.

The courts of other jurisdictions have announced the same principle, as, for instance: where the shipper refused to accept a car tendered him for the shipment of stock and selected another; where a shipper of livestock had his choice of shipping in either a stock car or a box car and chose the latter; injury resulting to the stock due to the character of the car; where the shipper's attention was called to the condition of the car by an agent of the carrier who offered to procure for him another car, which offer was refused; and in a case where the shipper knew the character of the car in which he was making the shipment and nevertheless accepted it and used it.

In all such cases carriers have been relieved of liability. See annotation in 5 A. L. R., page 112, et seq.

In the case at bar, the shipper did not select the car in which he shipped his goods, nor did he agree to assume any risk. In accordance with custom he made use of one of defendants' cars which, so far as the record shows, was the only one there, which he found on the track, with the full knowledge and consent of defendants' agent at Gayle. The agent, before issuing the bill of lading, ascertained that the car had been used to ship household goods, and according to his testimony he assumed that it was safe for the shipment of seed. The defendants, therefore, accepted the shipment of seed in that particular car and they cannot escape liability for injury to the shipment occasioned by defects in the vehicle furnished, upon the pretext that the shipper had the privilege of inspecting and did inspect the car.

No citation of authority is necessary in support of the general rule that it is the duty of a carrier to furnish a vehicle free from defects which might endanger the safety of the goods shipped and that the shipper has the right to assume that the vehicles furnished are in good condition and safe. It is the duty of common carriers to know the condition of their equipment. They have employees to inspect and repair their cars. It was shown in this

case that all cars are inspected at the terminals and, when found out of repair, are either held over for repairs or are sent out marked "In Bad Order". While one witness testified that this car had on it a "Bad Order" sign, yet the decided preponderance of the testimony is to the effect that no such sign appeared.

Defendants contend that the bad condition of the car "was or should have been known to the shipper".

The testimony discloses that the shipper did not know the condition of the car nor does it show that its condition should have been known to him. He looked at the car and it appeared to be in good condition. The defects in the roof were not apparent; they could not be detected, except by going on top of the car. The agent who received the shipment at New Roads, Louisiana, testified that he stood in the car and saw daylight through the top of it. If that be true, something happened to it in transit, for the testimony shows that no such defects were apparent when the car left Robson station. The question, therefore, is was the carrier relieved of liability for damage to the freight carried by the defective condition of the car, upon the ground that the shipper made an inspection of the car and reported that it was apparently in good condition, when the defects were not apparent but could be detected only by going to the top of the car, in the absence of an agreement by the shipper to assume the risk.

We do not think so.

In 10 Corpus Juris, page 87, the rule is stated to be that:

"Where the shipper of the goods voluntarily selects vehicles himself, by virtue of express contract or under circumstances which charge him with full knowledge of their capabilities and defects, relying on his own judgment and not on the duty of the carrier, the carrier is not liable for loss or injury caused by defects, except such as are latent and not readily discoverable."

So, in the case at bar, if it be true (and it is not) that the shipper voluntarily selected the car under an express agreement to assume the risk, the carrier is liable because the defects in the car "were latent and not readily discoverable".

The same text writer (10 Corpus Juris, page 88) says:

"The mere fact that the shipper has inspected the car, or knows of the defects, will not exempt the carrier from liability for loss or injury caused by such defects. No duty rests on the shipper to inspect a car furnished by a carrier or to exercise care to know whether the car is in condition."

The rule thus stated is amply supported by authority.

The amount of the loss claimed by the shipper is not disputed. The judge of the lower court held for plaintiff, and gave judgment for the full amount of the damage, with costs.

For the reasons assigned, it is ordered, adjudged and decreed that the judgment appealed from be affirmed, with costs.