MORIAL, Judge.
This is an action for expenses incurred by the plaintiff as the result of transferring a pressure vessel or boiler from one freight car to another, both cars being provided by the defendant. Without assigning written reasons or findings of fact, the district court awarded plaintiff damages of $2,160.-95 plus interest and costs. We affirm.
In April 1970 plaintiff contacted defendant about transportation for a pressure vessel or boiler consisting of a heater and tank measuring twelve feet, six inches in diameter, 90 feet long and weighing 149,-000 pounds. The pressure vessel or boiler was to be shipped to plaintiff’s customer in Charleston, South Carolina. Sometime in April 1970, Barrios, plaintiff’s production manager, recognizing that the item to be shipped was “real exotic,” requested clearance from the defendant and provided the defendant with a drawing of the pressure vessel or boiler showing its dimensions and weight. A clearance and routing were obtained from the defendant. In October 1970, plaintiff through Barrios, at the request of its customer, obtained a rerouting clearance.
Sometime within the first three months of 1971, Barrios contacted Cormier, defendant’s agent at Schiever, Louisiana and requested the car previously ordered. A newly painted car with its number, tare weight and load limit plainly stenciled thereon as required was delivered to plaintiff’s yard. The car was loaded exclusively by plaintiff’s employees. In securing the load, plaintiff’s employees welded steel plates over the load limit marking leaving only the letters “LDLMT” visible. An employee of the defendant inspected the load and informed plaintiff that it was not centered on the car. Plaintiff, at its expense, then centered the load as instructed by defendant railroad.
Prior to being placed in transit the car was inspected by an agent of defendant and again by agents of the connecting carriers, who questioned Barrios about the weight of the pressure vessel or boiler. Barrios told them the weight of the pressure vessel or boiler. After an internal check was made by the defendant the load limit of the care was determined to be 135,000 pounds maximum. Defendant informed plaintiff the car was overloaded and would not be placed in transit. Thereafter, defendant provided another car to which the cargo was transferred and put in transit.
Plaintiff contends the furnishing of an unsuitable car, i. e., one with a load limit below the known weight of cargo to be carried, caused damages resulting from the transfer of the pressure vessel or boiler onto another car.
Defendant contends its negligent act of providing an unsuitable car makes it liable for only the damages caused by the delay in obtaining a proper vehicle.
The question presented is: whether the transfer of the pressure vessel or boiler to another car was caused by the negligent act of the defendant-carrier in providing a car for carriage with a load limit below the weight of the item to be transported or was it proximately caused by the negligent act of the plaintiff-shipper in loading the car with an item in excess of the car’s posted load limit?
In Ellerbe v. Lancaster, 7 La.App. 105 (1927), the plaintiff shipped a car of cotton seed over defendant’s railroad line from Robson’s Station to New Roads, Louisiana. The roof of the car in which the seed was shipped leaked and the seed got wet in transit and as a result was damaged. In that case the shipper did not select the car. He shipped his goods in accordance with the custom at the time of using one of defendant’s cars, which was the only one he *51 found on the track, with full knowledge and consent of the defendant’s agent who assumed the car was suitable for the shipment of the cotton seed. There the court stated:
“ * * * The defendant, therefore, accepted the shipment of seed in that particular car and they cannot escape liability for injury to the shipment occasioned by defects in the vehicle furnished, upon the pretext that the shipper had the privilege of inspecting and did not inspect the car.
“No citation of authority is necessary in support of the general rule that it is the duty of the carrier to furnish a vehicle free from defects which might endanger the safety of the goods shipped and that the shipper has the right to assume that the vehicles furnished are in good condition and safe. * * Ellerbe v. Lancaster, supra, at p. 108.
In Atlantic Fruit Distributors v. Texas and Pacific Railway Company, 13 Orleans App. 348 (1916) the court held that where a shipper has elected the car without calling upon the carrier and the car was in defective condition the carrier could not be held responsible for the defect; however, the court said at p. 349:
“ * * * It is undoubtedly the duty of the carrier to furnish a suitable car, when requested to do so by the shipper; and he cannot shift this burden by imposing on the shipper the burden of inspecting the car thus furnished.”
The general rule is stated in 13 Am.Jur.2d § 173 at page 700 as follows:
“In general, there is no duty imposed upon a shipper to inspect a car or other vehicle furnished him by a common carrier for transportation of his goods, except where he has, by his own act or special contract, assumed the responsibility for the selection of the vehicle. It is the duty of the carrier to furnish a vehicle properly equipped and in proper condition for the particular service contemplated, and it is against the policy of the law to permit him to evade this duty by attempting to make a car inspector of the shipper, who may know nothing about cars or their equipment. * * * ”
There it is also stated that a carrier may not contract to impose a duty of inspection on the shipper, for to do so, would allow the carrier to contract away his duty.
In citing Ellerbe v. Lancaster, supra, 13 C.J.S. Carriers § 49, p. 95 sets forth the prevailing general rule:
“ * * * it is the primary duty of the common carrier to select and furnish cars suitable in every respect for the same transportation of inanimate property which it undertakes to carry, and any failure to observe its duty in this regard will render it liable for loss or injury caused thereby. * * * ” (Emphasis supplied)
Again citing Ellerbe v. Lancaster, supra, 13 C.J.S. Carrriers § 53, p. 99 states:
“ * * * Ordinarily it is not the shippers duty to specify the type of cars to be furnished, or to inspect cars furnished, and the mere fact that the shipper has inspected a car, or knows of the defect, will not exempt the carrier from liability for loss or injury resulting from such defects at least where, as a practical matter, the shipper has no course but to accept the cars in an unsuitable condition * $ * ”
It is abundantly clear that the jurisprudence of this state squarely places the duty on the carrier to supply and furnish the shipper with a car suitable in every respect to meet its needs and requirements for the cargo to be shipped. This rule must apply to the circumstances of this case. Here the plaintiff-shipper contacted the defendant-carrier more than eight months pri- or to the time of loading and, at that time supplied the defendant-carrier with detailed drawings and specifications including the weight of the pressure vessel or boiler. *52 The car provided was an 85 foot flatcar of the type the shipper was advised by the defendant to expect. It was only after several inspections by railroad employees, who we must presume are experienced and knowledgeable, that the error was finally discovered.
Defendant also contends that, had a proper inspection been made by the plaintiff the load limit would have been discovered and no damage would have resulted other than that of the delay in loading the pressure vessel or boiler onto a suitable car.
Defendant refers us to A. J. Tebbe & Sons Co. v. Brown Express, 161 Tex. 456, 341 S.W.2d 642 (1960) in support of its argument. In that case the plaintiff sued to recover damages sustained in the transportation of onions in an unvented trailer furnished by the defendant carrier. The court there remanded the case because the evidence did not “show that petitioner knew the trailer was unvented, * * The court considered actual knowledge of unsuitability of the car to be essential to a finding that the shipper was either negligent or assumed the risk. However, in Tebbe, supra, the court did state:
“In the absence of the contract or other special circumstances giving rise to the duty, however, the shipper is under no obligation to inspect a vehicle furnished by the carrier and will not be charged with knowledge of defects simply because the same would have been disclosed by a proper inspection, * * 341 S.W.2d at page 648
For the obligation to inspect to be shifted to the shipper it would be necessary for the shipper to have elected the car for shipment, or for a contract or other special circumstance to give rise to the duty. See 13 Am.Jur.2d 174.
The load limit of the car was within the peculiar knowledge of the defendant-carrier. It must of necessity know the load limits of cars to protect its equipment and road bed. Had the damage been caused by a latent defect unknown to the carrier, the carrier could not escape liability by showing that the shipper inspected and accepted the car. Accordingly the plaintiff-shipper, having no duty to inspect, should not be held or charged with notice of the unsuitability of car knowingly provided to it by the defendant-carrier. We are of the opinion that it is clearly foreseeable that the supplying of a car of the character required, except as to its load limit, could conceivably result in the overloading of that car.
Under the evidence and the record of this case we find it inappropriate to hold plaintiff negligent in failing to make an inspection or to discover the inadequacy of the load limit of the car provided by the defendant to transport the pressure vessel or boiler, the weight of which had been provided the defendant-carrier.
The judgment of the district court is affirmed.
Affirmed.